IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| JOSEPH E. ELLSWORTH, | ) | CASE NO. 3:15-CV-02173 |
| | ) | |
| Plaintiff, | ) | JUDGE JEFFREY J. HELMICK |
| | ) | |
| v. | ) | |
| | ) | MAGISTRATE JUDGE |
| COMMISSIONER OF SOCIAL SECURITY, | ) | THOMAS M. PARKER |
| | ) | |
| Defendant. | ) | |
| | ) | **REPORT & RECOMMENDATION** |
| | ) | |

## I.      Introduction

Plaintiff, Joseph E. Ellsworth ("Ellsworth"), seeks judicial review of the final decision of the Commissioner of Social Security denying his application for Supplemental Security Income benefits under Title XVI of the Social Security Act ("Act") and Disability Insurance Benefits under Title II of the Act.  This matter is before the court pursuant to 42 U.S.C. §1383(c)(3), 42 U.S.C. §405(g) and Local Rule 72.2(b).

For the reasons set forth below, it is recommended that the final decision of the Commissioner be AFFIRMED.

## II.      Procedural History

Ellsworth protectively[1] filed applications for Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI) disability on April 9, 2012, alleging a disability onset date

---

[1] Protective filing is a Social Security term for the first time you contact the Social Security Administration to file a claim for disability or retirement. Protective filing dates may allow an individual to have an earlier application date than the actual signed application date. This is important because protective filing often affects the entitlement date for disability and retirement beneficiaries along with their dependents.  http://www.ssdrc.com/disabilityquestionsmain20.html (Last visited 7/19/16).

of January 2, 2007.  (Tr. 184-196, 208)  He claimed disability based upon a learning disability

("approx. fifth grade level") (caps omitted) and nervous disorder.  (Tr. 220)  After denials of his

applications initially (Tr. 114-119) and upon reconsideration (Tr. 112-113, 125-135), Ellsworth

requested an administrative hearing (Tr. 136).  At that time, he argued that he was disabled due

to a combination of impairments including taking special education classes in high school, back

pain, tremors, depression, and anxiety.  (Id.)

A hearing was held before Administrative Law Judge ("ALJ") Scott M. Staller on May

27, 2014.  (Tr. 36-57)  In his August 7, 2014, decision, (Tr. 15-35) the ALJ determined, based

upon Ellsworth's age, education, work experience, and residual functional capacity ("RFC"), that

there are jobs existing in significant numbers in the national economy that he can perform and,

therefore, is not disabled.  (Tr. 29-30)  Ellsworth requested review of the ALJ's decision by the

Appeals Council.  (Tr. 7-12)  On August 21, 2015, the Appeals Council denied review, rendering

the ALJ's August 7, 2014, decision the final decision of the Commissioner. (Tr. 1-6)


III.    **Evidence**

A.  **Personal, Educational, and Vocational Evidence**

Ellsworth was born on April 21, 1965 and was 47 years old on the date that his

application was filed.  (Tr. 184)  He graduated from high school after completing special and

general education classes.  (Tr. 40-41, 73, 310-311, 405-06).  Ellsworth has past relevant work as

a construction worker and a landscape laborer.  (Tr. 28)


B.  **Medical Evidence**

The medical records related to plaintiff's arguments and defendant's responses are

2

summarized below.[2]

### 1.  Rescue Mental Health Services

On January 13, 2014, Ellsworth sought treatment at Rescue Mental Health Services with Dr. Joseph Habib.  (Tr. 419-430)  Ellsworth was diagnosed with Major Depressive Disorder Recurrent Moderate at that visit.  (Tr. 426)  Dr. Habib stated that Ellsworth had some minor difficulty with memory and estimated his intelligence as "average."  (Tr. 429)

### 2.  Unison Records

Between January 28, 2014 through May 2, 2014, Ellsworth sought treatment at Unison Behavioral Healthcare. (Tr. 431-450)  On March 6, 2014, he was given an initial psychiatric evaluation by Alamdar Kazmi, M.D.  (Tr. 440-442).  Dr. Kazmi opined that Ellsworth had low-average intelligence to borderline intellectual functioning.  (Tr. 441)  He diagnosed Ellsworth with Major Depressive Disorder, Recurrent; Generalized Anxiety Disorder; and PTSD, chronic. (Id.)  During his treatments with Unison, Ellsworth's memory and concentration were reported to be intact and adequate (Tr. 435, 436, 438, 443, 447, 449) and his intelligence was noted to be "below expected limits." (Tr. 435, 449).

### 3.  Dr. Tanley – Consultative Examination

At the state agency's request, Ellsworth met with James C. Tanley, Ph.D. on July 3, 2012. (Tr. 390-393).  Dr. Tanley conducted a clinical interview and had a psychology assistant conduct a Wechsler Adult Intelligence Scale-Fourth Edition IQ test ("WAIS-IV").  (Tr. 390)  The WAIS-IV is reported as five scores:  verbal comprehension, working memory, perceptual

---

[2] Ellsworth only challenges the ALJ's findings with respect to his mental impairments.  Accordingly, only the medical evidence relating to those arguments is summarized herein.

reasoning, processing speed, and full scale.[3]  Ellsworth scored 63 in both working memory and verbal comprehension.  (Tr. 392)   He also scored 76 in processing speed, 94 in perceptual reasoning, and received a full scale score of 71.[4]  (Id.)  Dr. Tanley stated that the 31 point difference between the verbal comprehension and perceptual reasoning assessments was "significant and highly suggestive of a Learning Disorder for Verbally Oriented Material." (Id.)  Thus, Dr. Tanley diagnosed Ellsworth with a learning disorder "in lieu of Borderline intelligence overall."  (Id.)

### 4.  Dr. Patricia Semmelman – Reviewing Psychologist

In January 15, 2013, state agency reviewing psychologist Patricia Semmelman, Ph.D. completed a mental residual functional capacity assessment ("MRFC") on Ellsworth's behalf. (Tr. 92-94)  In the MRFC, Semmelman noted moderate difficulties in Ellsworth's ability to remember locations and work-like procedures; understand and remember detailed instructions/ carry out detailed instructions; respond appropriately to workplace changes; maintain attention and concentration for extended periods; complete a normal workday and workweek without interruptions from psychologically based symptoms and perform at a consistent pace without a reasonable number and length of rest periods.  (Tr. 92-94)   Dr. Semmelman opined that Ellsworth can perform short, routine tasks in work setting that does not demand fast paced production and where changes are infrequent.  (Tr. 93)  Dr. Semmelman further opined that Ellsworth can understand and remember simple instructions and can follow 1-2 step oral and

---

[3]  The records refer to these categories by their abbreviations:  VCI, WMI, PRI, PSI, and FSIQ, respectively.  (e.g., Tr. 392)  The abbreviations were translated by using the testing provider website.  See images.pearsonclinical.com/images/assets/WAIS-IV/WAISIV2_6_08.pdf (last visited July 22, 2016) (Pg. 12).

[4]  Section 12.00 D of the Appendix provides that "where more than one IQ is customarily derived from the test administered ... *the lowest of these is used in conjunction with listing 12.05*," (emphasis added).

very simply written instructions.  (Tr. 92)  She also stated that "instructions may require repetition and simplification."  (Id.)

### C.  **Third Party Reports**

#### 1.  **Charles Brugler, M.A.**

Ellsworth's high school special education instructor, Mr. Charles Brugler, M.A., submitted a letter on Ellsworth's behalf dated February 26, 2013.  (Tr. 405-06)  In the letter, Brugler states that Ellsworth was a student in Brugler's self-contained special education class from 1984-1986.  (Tr. 405)  Mr. Brugler stated that Ellsworth was placed in his class following a severe learning disability diagnosis resulting from intelligence testing, though he could not recall all specifics of the testing results.  (Tr. 405-406)  Mr. Brugler stated that Ellsworth was one of the best students in his class and excelled while working part-time at "Mary Maids."  (Tr. 406)  He opined that due to his severe learning disability he will always deal with cognitive issues and require assistance in certain situations.  (Id.)

#### 2.  **Emanuel Ellsworth**

Ellsworth's brother Emanuel "Manny" Ellsworth completed a third party function report.  (Tr. 300-301)  Manny Ellsworth stated that he lived with his brother for over a year and helped him with scheduling and keeping track of appointments.  (Tr. 300)  He also stated that Ellsworth had not lived alone for more than a few months in his adult life and has obtained most of his jobs through family.  (Id.)  He asserted that Ellsworth can read only basic words but needs help understanding anything more complicated than that.  (Id.)

#### 3.  **Patricia Kenze**

In June 2012, Ellsworth's friend Patria Kenze also completed a third party function

report.  (Tr. 252-259)  Ms. Kenze checked boxes off that indicated Ellsworth had problems with concentration and understanding.  (Tr. 257)

### D.  **Testimonial Evidence**

#### 1.  **Ellsworth's Testimony**

At the administrative hearing on May 27, 2014, Ellsworth was represented by counsel and testified that he was born on April 21, 1965, making him 49 years old at the time of the hearing.  (Tr. 40)   He further testified that he graduated from high school after taking special education courses.  (Tr. 41)  Ellsworth testified regarding his work history, stating that from 2003-2005 he worked for Chamberlain Irrigation and Landscape (mowing lawns and planting flowers) and from 2006-2007 he worked for Ark Wall Systems ("us[ing] a chop saw to cut metal studs, and plac[ing] them into place, screw[ing] them with a screw – or a drill gun").  (Tr. 41)  Ellsworth testified that he stopped working in 2007 because his brother left the company and he no longer had a way to get to work and did not feel comfortable enough with the other employees.  Tr. 42.  Ellsworth also stated that his brother was his supervisor at Ark Wall systems and helped him at the job by telling him what to do and how to do it.  (Tr. 42)  Ellsworth stated he has not completed any full or part-time work since January 2, 2007.  (Id.)

Next, Ellsworth testified regarding problems with his lower back pain, stating that he is in in constant pain on the left-hand side of his low back.  (Tr. 43)   Ellsworth also testified about social and psychological problems, indicating that he has extreme problems getting along with others and is often anxious and nervous.  (Tr. 44)  He stated that he has benign tremors which increase his anxiety.  (Tr. 47, 50)  He testified that he is taking medication for his stress and going to Unison for mental health treatment.  (Tr. 44)   He explained that the medicine helps to ease his anxiety.  (Tr. 47)

On a typical day, Ellsworth stated he watches television, showers, dresses himself, eats, and occasionally goes to the store with his brother.  (Tr. 44-45)  He stated that he lives with his brother and his brother's partner and does not complete any housework.  (Tr. 45)   He further states that he has always lived with family members.  (Tr. 51)  Ellsworth testified that he completed high school and passed a written driver's license tests but explained that he reads at a third or fourth grade level and that his family members usually help him with reading and filling out forms.  (Tr. 47-48)

### 2.  Vocational Expert's Testimony

Vocational Expert Devin Lessne ("VE") testified at the hearing.  (Tr. 52-57)  The VE testified as to the exertional and skill level of Ellsworth's past relevant work as follows: construction worker (heavy, semi-skilled); [5] street cleaner (light, unskilled); chimney sweep (medium, semi-skilled); laborer/landscaper (medium/heavy, unskilled).  (Tr. 52-53).

The ALJ then asked the VE to assume an individual of Ellsworth age, education, and work experience who could perform no greater than medium work; frequently climb ramps or stairs; never climb ladders, ropes, or scaffolds; frequently balance, stoop, kneel, crouch, or crawl; avoid all exposure to the operational control of moving machinery and unprotected heights; able to perform simple, routine, and repetitive tasks in a work environment free of fast-paced production requirements; who could only tolerate occasional changes in the work setting; with no public interaction and only occasional interaction with co-workers and supervisors; able to maintain attention and concentration for two-hour segments over an eight-hour period; and able

---

[5] At the hearing the VE referred to SVP to identify the skill level for past work.  The DOT lists a specific vocational preparation (SVP) time for each described occupation. Using the skill level definitions in 20 CFR 404.1568 and 416.968, unskilled work corresponds to an SVP of 1-2; semi-skilled work corresponds to an SVP of 3-4; and skilled work corresponds to an SVP of 5-9 in the DOT. https://www.ssa.gov/OP_Home/rulings/di/02/SSR2000-04-di-02.html (last visited 7/19/16).

to complete a normal work week without excessive interruptions from psychological or physical symptoms. (Tr. 53-54). The VE testified that this hypothetical individual could perform Ellsworth's past work as a street cleaner but not any other past relevant work.[6] (Tr. 54) The VE further states that the hypothetical individual could perform work as a laundry laborer (29,000 national jobs), an agricultural produce packer (29,000 national jobs), and a kitchen helper (100,000 national jobs). (Tr. 54-55)

Next, the ALJ asked the VE if there were any jobs for the same individual referenced in the first hypothetical with an additional limitation that the individual would be off-task twenty percent or more of the work day and if the person missed two days or more of work per month. (Tr. 55) The VE testified that with either additional limitation there would be no jobs for such a hypothetical individual. (Id.) Ellsworth's counsel was then given the opportunity to question the VE. (Tr. 56-57). Ellsworth's counsel asked the VE if there were any jobs for a person who would require "supervision above the norm such that he needed assistance with tasks on a more-than-occasional basis." (Tr. 56) The VE responded that competitive employment would be precluded for such an individual. (Tr. 57)

## IV.    Standard for Disability

Under the Act, 42 U.S.C. § 423(a), eligibility for benefit payments depends on the existence of a disability. "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(a). Furthermore:

---

[6] It was later determined that Ellsworth's work as a street cleaner did not qualify as past relevant work. (Tr. 28)

8

[A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy[7]….

42 U.S.C. § 423(d)(2)(A).

In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations. The five steps can be summarized as follows:

1. If the claimant is doing substantial gainful activity, he is not disabled.

2. If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3. If claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment,13 claimant is presumed disabled without further inquiry.

4. If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if claimant's impairment prevents him from doing past relevant work. If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5. If claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.R.F. §§ 404.1520, 416.920; *Bowen v. Yuckert,* 482 U.S. 137, 140-142 (1987).  Under this sequential analysis, the claimant has the burden of proof at Steps One through Four. *Walters v. Comm'r of Soc. Sec.* 127 F.3d 525, 529 (6th Cir. 1997).  The burden shifts to the Commissioner

---

[7] "'[W]ork which exists in the national economy' means work which exists in significant numbers either in the region where such individual lives or in several regions of the country." 42 U.S.C. § 423 (d)(2)(A).

at Step Five to produce evidence that establishes whether the claimant has the RFC and

vocational factors to perform work available in the national economy. *Id.*

**V.     The ALJ's Decision**

The ALJ issued a decision on August 7, 2014.  A summary of his findings is as follows:

1. Ellsworth met the insured status requirements of the Social Security Act
   through September 30, 2007. (Tr. 20)

2. Ellsworth has not engaged in substantial gainful activity since January 2,
   2007, the alleged onset date.  (Tr. 20)

3. Ellsworth has the following severe impairments: degenerative disc disease of
   the lumbar spine, a learning disorder, borderline intellectual functioning, and
   alcoholism.  (Tr. 20)

4. Ellsworth does not have an impairment or combination of impairments that
   meets or medically equals the severity of one of the listed impairments.  (Tr.
   20)

5. Ellsworth has the residual functional capacity ("RFC") to perform medium
   work as defined in 20 CFR 404.1567(c) and 416.967(c) with the following
   limitations:  he could frequently climb ramps or stairs, but never climb
   ladders, ropes or scaffolds. He could frequently balance, stoop, kneel, crouch
   or crawl. He must also avoid all exposure to the operational control of moving
   machinery and unprotected heights.  He would be able to perform simple,
   routine, and repetitive tasks in a work environment free of fast-paced
   production requirements.  He could only tolerate occasional changes in the
   work setting.  He should have no interaction with the public and only
   occasional interaction with coworkers and/or supervisors.  He would be able
   to maintain attention and concentration for two-hour segments over an eight-
   hour period and complete a normal workweek without excessive interruptions
   from psychologically or physically based symptoms.  (Tr. 23)

6. Ellsworth is unable to perform any past relevant work.  (Tr. 28)

7. Ellsworth was born on April 21, 1965 and was 41 years old, which is defined
   as a younger individual age 18-49, on the alleged disability onset date.  (Tr.
   29)

8. Ellsworth has a limited education and is able to communicate in English.  (Tr.
   29)

9.  Transferability of job skills is not material to the determination of disability because using the Medical-Vocational rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills.  (Tr. 29)

10. Considering Ellsworth's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that he can perform.  (Tr. 29)

11. Ellsworth had not been under a disability, as defined in the Social Security Act, from January 2, 2007 through August 7, 2014 (the date of the ALJ's decision).  (Tr. 30)

## VI.  Standard of Review

This court's review is limited to determining whether there is substantial evidence in the record to support the ALJ's findings of fact and whether the correct legal standards were applied. *See Elam v. Comm'r of Soc. Sec.,* 348 F.3d 124, 125 (6th Cir. 2003) ("decision must be affirmed if the administrative law judge's findings and inferences are reasonably drawn from the record or supported by substantial evidence, even if that evidence could support a contrary decision."); *Kinsella v. Schweiker,* 708 F.2d  1058, 1059 (6th Cir. 1983).  Substantial evidence has been defined as "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.,* 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.,* 25 F.3d 284, 286 (6th Cir. 1994).

The Act provides that "the findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive."  42 U.S.C. §§ 405(g) and 1383(c)(3). The findings of the Commissioner are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion.  *Buxton v. Halter,* 246 F.3d 762, 772-3 (6th Cir. 2001) (*citing Mullen v. Bowen,* 800 F.2d 535,545 (6th Cir. 1986); *see also Her v.*

11

*Comm'r of Soc. Sec.,* 203 F.3d 288, 389-90 (6th Cir. 1999) ("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached." *See Key v. Callahan,* 109 F.3d 270, 273 (6th Cir. 1997). This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference. *Mullen,* 800 F.2d at 545 (*citing Baker v. Heckler,* 730 F.2d 1147, 1150 (8th Cir. 1984).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the court must determine whether proper legal standards were applied. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal. *See e.g. White v. Comm'r of Soc. Sec.* 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.,* 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.")

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue,* 774 F.Supp.2d 875, 877 (N.D. Ohio 2011) (*quoting Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir. 1996); *accord Shrader v. Astrue,* No. 11-13000, 2012 U.S. Dist. LEXIS 157595 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue,* No. 1:10-cv-734, 2011 U.S. Dist. LEXIS 141342 (S.D. Ohio Nov. 15, 2011); *Gilliams v. Astrue,* No. 2:10-CV-017, 2010 U.S. Dist. LEXIS 72346 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, No. 1:09-cv-19822010, 2010 U.S.

Dist. LEXIS 75321 (N.D. Ohio July 9, 2010).

## VII.  Legal Analysis

### A.  Parties' Arguments

Ellsworth asserts that the ALJ erred in the following two ways.  First, he argues that the ALJ erred by failing to find that he met Listing 12.05, Intellectual Disability.[8]  Doc. 24, pp. 10-16.  He asserts that the ALJ used an improper analysis and selective review of the record to reach his conclusions.  Id. at p. 10.  Second, he argues that the ALJ erred by giving significant weight to the opinion of state agency psychologist Dr. Semmelman but omitting significant limitations identified by Dr. Semmelman without explanation.  Id. at pp. 16-18.  The Commissioner counters that the Ellsworth does not meet Listing 12.05 and asserts that the ALJ properly analyzed the opinion of Dr. Semmelman.  Doc. 16, pp. 9-19.

### B.  Listing 12.05C

Ellsworth argues that the ALJ erred in failing to find that he met Listing 12.05, Intellectual Disability.  More specifically, Ellsworth argues (1) that the ALJ improperly invalidated his IQ scores, and (2) that the ALJ improperly analyzed Ellsworth's deficits in adaptive functioning.  Doc. 14, pgs. 10-15.  The Commissioner counters that substantial evidence supports the ALJ's decision that Ellsworth did not meet Listing 12.05C.[9]  Doc. 16, pgs. 10-16.

---

[8] Effective September 3, 2013, the Social Security Administration replaced the term mental retardation with the term intellectual disability as a listed impairment. Change in Terminology: "Mental Retardation" to "Intellectual Disability," 78 Fed.Reg. 46499 (Aug. 1, 2013) This change "d[id] not affect the actual medical definition of the disorder or available programs or services." Id. at 49500. We follow the agency's current nomenclature.  Case law cited herein may use either term depending on the date of the decision.

[9] The Commissioner also asserts that the ALJ's decision should be affirmed because Ellsworth has not demonstrated objective evidence of subaverage intellectual functioning prior to age twenty-two.  The Commissioner claims that Ellsworth's intellectual abilities "may have declined after he turned twenty-two due to his history with alcohol."  Doc 16, pg. 12.  However, the ALJ did not address this issue in his Step

In order to qualify as disabled under Listing 12.05, a claimant needs to satisfy both the diagnostic description in the introductory paragraph of Listing 12.05 and one of the four sets of criteria found in Subparts A through D. 20 C.F.R. § 404.1525(c)(3); *Foster v. Halter*, 279 F.3d 348, 354-55 (6th Cir. 2001). The diagnostic description is as follows:

> Intellectual disability refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22.

Thus, to satisfy the diagnostic description, a claimant must prove that he meets three factors: "(1) subaverage intellectual functioning; (2) onset before age twenty-two; and (3) adaptive-skills limitations." *Hayes v. Comm'r of Soc. Sec*., 357 F. Appx. 672, 675 (6th Cir. 2009) (citing Foster v. Halter, 279 F.3d 348, 354 (6th Cir. 2001). "The adaptive skills prong evaluates a claimant's effectiveness in areas such as social skills, communication skills, and daily-living skills." *Id*. at 677.

The additional Subpart C criteria are:

> C. A *valid* verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function.

20 C.F.R. Part 404, Subpt. P, App. 1, Listing §12.05C (emphasis added).  Thus, to meet Listing 12.05C, a plaintiff must demonstrate: (1) "significantly sub-average general intellectual functioning with deficits in adaptive functioning manifested before age 22," (2) a valid IQ of 60 through 70, and (3) "a physical or other mental impairment imposing an additional and

---

Three analysis.  Since the ALJ did not cite this as a basis for finding that Ellsworth did not meet Listing 12.05, this court "may not accept appellate counsel's post hoc rationalizations for agency action [because] it is well-established that an agency's action must be upheld, if at all, on the basis articulated by the agency itself." *Berryhill v. Shalala*, 4 F.3d 993 (6th Cir.1993) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co*., 463 U.S. 29, 50, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983) (citation omitted)). *See also Fury v. Comm'r of Soc. Sec*., 5:11–cv–1660, 2012 WL 4475661 at *3 (N.D. Ohio Sept.26, 2012) (denying to review an issue raised by the Commissioner that was not previously raised at the administrative level because it would require the court to conduct a *de novo* review).

significant work-related limitation of function." 20 C.F.R. pt. 404, Subpt. P, app. 1, § 12.05.

In this case, the ALJ found that Ellsworth failed to meet subpart C criteria. (Tr. 22-23)

### 1. Validity of IQ Score

Criteria two of §12.05C requires a *valid* verbal, performance, or full scale IQ score of 60 through 70. 20 C.F.R. 404, Subpt. P, Appx. 1 § 12.05C. In July 2012, Ellsworth took the WAIS-IV IQ test during a consultative exam with Clinical Psychologist and Neuropsychologist Dr. James C. Tanley, Ph.D. (Tr. 390-393). Ellsworth scored 63 in the working memory and verbal comprehension categories. (Tr. 392) He also scored 76 in processing speed, 94 in perceptual reasoning, and received a full scale score of 71. (Id.) The ALJ acknowledged that Ellsworth presented IQ scores in the required range,[10] but found that the scores did not provide a valid indication that Ellsworth was intellectually disabled. (Tr. 23) The ALJ determined that the scores were invalid because, in the narrative report accompanying the test, Dr. Tanley disregarded the lower scores. Dr. Tanley stated that the 31-point difference between Ellsworth's verbal and perceptional reasoning scores was "significant and strongly suggestive of a learning disorder for verbally oriented material." (Tr. 23) The ALJ also concluded that Ellsworth's "adaptive functioning appears significantly higher than his lower subtest scores suggest." (Id.)

Ellsworth argues that the ALJ improperly discounted his listing-level IQ scores by looking to evidence outside the test itself. Doc. 14, pp. 10-12. Ellsworth's argument is unpersuasive. Contrary to the implication of Ellsworth's argument, the existence of an IQ score within the listed range is not, by itself, determinative. The goal of the testing is to determine the presence of intellectual disability. *Tullius v. Astrue*, No. 2:10-CV-00455, 2011 WL 839259, at *5

---

[10] Section 12.00 D of the Appendix provides that "where more than one IQ is customarily derived from the test administered ... *the lowest of these is used in conjunction with listing 12.05.*" (emphasis added).

(S.D. Ohio Mar. 4, 2011).

It is well established that an ALJ may look to factors outside the test results themselves in order to determine whether IQ data provide a valid basis for concluding that a claimant is intellectually disabled.  For example, courts have approved an ALJ's decision to disregard IQ scores when there test subject demonstrated bad faith during the administration of the testing. *See, e.g., Shepherd v. Sullivan,* 889 F.2d 1088, at *1 (6th Cir.1989) (unpublished) ("[T]his IQ test was invalid due to bad faith and malingering"); *see also Lipford v. Sec'y of HHS,* 762 F.2d 1009 (6th Cir.1985) (unpublished).  Other factors outside of the test itself, including life skills, daily activities, and past work experience have all been considered proper bases upon which to disregard IQ test scores as well. *See McDonald v. Sec'y of HHS,* 786 F.2d 1165, at *13 (6th Cir.1986) (unpublished) ("Care should be taken to ascertain that test results are consistent with daily activities and behavior."); *Brooks v. Astrue,* 2010 U.S. Dist. LEXIS 27583, * 11 (N.D. Ohio 2010) (recognizing that factors outside the test itself, including daily activities and past work experiences, may be considered when determining the validity of an IQ score); *Albright v. Astrue,* 2011 U.S. Dist. LEXIS 117768, *29, 2011 WL 4833125 (N.D. Ohio 2011) ("In assessing the validity of a claimant's IQ, information from both medical and non-medical sources may be used to obtain detailed descriptions of the individual's activities of daily living, social functioning, concentration, persistence and pace; or ability to tolerate stress.").

Determinations under Listing 12.00 are actually *required* to consider extra-test information:

> The results of standardized intelligence tests may provide data that help verify the presence of intellectual disability or organic mental disorder, as well as the extent of any compromise in cognitive functioning. However, since the results of intelligence tests *are only part of the overall assessment*, the narrative report that accompanies the test results should comment on whether the IQ scores are

16

considered valid and consistent with the developmental history and the degree of functional limitation.

20 C.F.R. 404, Subpt. P, Appx. 1 § 12.00(D)(6)(a) (emphasis added).  An ALJ cannot comply with this standard without considering an accompanying narrative report, developmental history and any evidence of functional limitations.  Accordingly, the ALJ here was required to consider factors external to the test scores themselves, including the testing narrative report and evidence of plaintiff's adaptive functioning, in determining whether the test scores provided valid evidence that Ellsworth met Listing 12.05.

Having found that the ALJ was required to consider the factors that he did, it must next be determined whether there was substantial evidence to support the ALJ's conclusion that Ellsworth's IQ scores did not demonstrate his intellectual disability.  For the following reasons, it is respectfully recommended that the court conclude that the ALJ's decision was properly supported.

In his narrative report accompanying the IQ test, Dr. Tanley stated that the 31 point verbal comprehension-perceptual reasoning score difference was "significant" and he opined that it was "strongly suggestive" or a learning disorder for verbal material.  (Tr. 392-93)  He further stated that, "scores on the WAIS-IV suggest that as the task complexity increases, particularly verbal tasks, [Ellsworth] may encounter significant and increasing difficulties.  Were the task more perceptually oriented, then the likelihood is he would have little to no difficulty."  (Tr. 393)  Thus, the narrative report that accompanying Ellsworth's IQ test directly analyzed the lower scores, and Dr. Tanley clearly opines that, even with low scores, Ellsworth should not be diagnosed with intellectual disability.  This Court has previously found that when a test administrator imposes restrictions on the use of IQ test results, those results cannot be considered

valid evidence of intellectual disability.  *See Fulce v. Comm'r of Soc. Sec.,* No. 3:13 CV 2245, 2015 WL 1189173, *1 (N.D. Ohio Mar. 16, 2015).

In addition to Dr. Tanley's narrative report, the treatment notes and opinions in Ellsworth's medical records further support the ALJ's limitation on the use of the low IQ scores. The ALJ pointed out that Ellsworth consistently showed intact working memory, as well as adequate comprehension and understanding in clinical exams.  (Tr. 23, citing 5F and 13F)  A review of the medical treatment records supports this determination.  While treating at Unison Behavioral from January through May 2014, Ellsworth was consistently reported as having intact memory and adequate concentration.  (Tr. 435, 436, 438, 443, 447, 449)  Dr. Tanley also reported that Ellsworth's recent and remote memory "were essentially intact."  (Tr. 392)  In addition to intact memory and comprehension, the ALJ noted Dr. Tanley's finding with respect to verbal tasks.  (Tr. 23)  Also, as noted above, Dr. Tanley stated that although Ellsworth could experience difficulty with complex tasks (particularly verbal ones), he would likely encounter little to no difficulty if the tasks were more perceptually oriented.  (Id., 393)

The absence of any intellectual disability diagnosis in the medical records provided further grounds for the ALJ's decision to discount the importance of Ellsworth's low IQ scores. Dr. Tanley diagnosed Ellsworth with a learning disorder in lieu of borderline intelligence.  (Tr. 23, 26, 392)  Dr. Kazmi, at Unison Behavioral, opined that Ellsworth "appeared to have low-average intelligence to borderline intellectual functioning."  (Tr. 27, 441)  Borderline intelligence, by definition, is a "less severe diagnosis" than intellectual disability.  *Justice v. Comm'r Soc. Sec. Admin.*, 515 F. App'x 583, 587 (6th Cir. 2013); *See also Cooper v. Comm'r of Soc. Sec.*, 217 Fed. Appx. 450, * 452 (6th Cir. 2007) (drawing a distinction between a diagnosis of mental retardation and borderline intellectual functioning).  Even the third party letter from

18

Mr. Brugler, Ellsworth's former special education instructor, stated that Ellsworth had been diagnosed with a "severe learning disability," and made no mention of an intellectual disability or mental retardation diagnosis.  (Tr. 406)  Ellsworth presented no evidence that any qualified professional ever diagnosed him as intellectually disabled.  While the absence of an intellectual disability diagnosis is not dispositive, it may be considered by an ALJ when determining whether a claimant has proven that he meets the requirements of Listing 12.05.  *Id.*; *Brooks v. Astrue,* 2010 U.S. Dist. LEXIS 27583, * 17 (N.D. Ohio 2010).  Thus, the medical treatment notes and a lack of a diagnosis of intellectual disability provided further evidence to limit the significance of Ellsworth's IQ scores.  *See Beard v. Comm'r of Soc. Sec.,* No. 5:13 CV 1704, 2014 WL 2919211, at *16 (N.D. Ohio June 27, 2014) (allowing medical treatment records reflecting normal mental status to be used as evidence to invalidate IQ scores).

The ALJ also concluded that Ellsworth's adaptive functioning appeared to be higher than his lower subtest scores would suggest, pointing to his ability to drive, to meet his basic needs, and to perform maintenance and landscaping work on homes owned by his roommate.  (Tr. 23, 27, 28).  Ellsworth argues that the ALJ improperly found these items to be inconsistent with an intellectual disability in reliance upon the analysis in *Brown v. Sec. of HHS*, 948 F.2d 268, 269 (6th Cir. 1991).  In that case, the Sixth Circuit determined that Claimant Brown's ability to possess a driver's license, visit friends, make change, do his own laundry, complete the sixth grade, and work as a truck driver was not inconsistent with a valid IQ of 68.  *Id.* at 27.  However, *Brown* is distinguishable.  First, the claimant in *Brown* only completed school through the sixth grade.  In contrast, although Ellsworth attended special education classes while in school, he completed high school.  More importantly, here, unlike *Brown*, the ALJ did not rely solely on adaptive and work related functioning to limit the significance of the claimant's IQ scores.

19

Rather, the ALJ relied on a narrative report accompanying Ellsworth's IQ test scores – which called into question whether the scores provided valid evidence of intellectual disability – as well as medical evidence from Dr. Tanley and Unison Behavioral. *See O'Conner v. Comm'r of Soc. Sec. Admin.,* No. 4:13-CV-00072, 2013 WL 6817900, at *10 (N.D. Ohio Dec. 23, 2013) (distinguishing *Brown* for reasons including claimant's further completion of school, a lack of diagnosis of intellectual disability by any doctor, and other factors); *Albright v. Astrue*, No. 5:10-CV-2274, 2011 WL 4833125, at *11 (N.D. Ohio Oct. 12, 2011) (distinguishing *Brown* for reasons including claimant's further completion of school and substantial evidence supported the ALJ's conclusion that the IQ scores were invalid). Further, even if Ellsworth's adaptive functioning could have been argued to be consistent with his low IQ scores, the ALJ relied on other evidence in the record to limit the significance of the scores, as discussed in the preceding paragraphs. Thus, the ALJ's decision to invalidate Ellsworth's IQ scores was supported by substantial evidence.

Ellsworth asserts that other evidence in the record supports his contention that his low IQ scores are evidence that he is intellectually disabled. Ellsworth points to his own reports of deficits in adaptive functioning – which the ALJ found to be partly credible (Tr. 28) – that he needs assistance reading letters, completing forms, and keeping track of appointments; and that he obtained many jobs working with family members and was in special education classes. Doc. 14, p. 13. He also points to a function report submitted by his brother, Manny Ellsworth. Id., at p. 14. Ellsworth argues that the ALJ ignored his brother's report. Id.

Social Security Rule 06–03p, in combination with 20 CFR §§ 404.1513(d) and 416.913(d), provide that an ALJ *may* consider evidence from other sources, such as friends and family, to determine the severity of a claimant's impairments and whether the impairments affect

a claimant's ability to function.  But there is no requirement that the ALJ discuss the statements in great detail or offer good reasons for rejecting them.  *Walsh v. Colvin*, No. 3:15CV1708, 2016 WL 1752854, at *19 (N.D. Ohio May 3, 2016).  Here, however, the ALJ did discuss Manny Ellsworth's report.  The ALJ stated that he reviewed third party function reports from Ellsworth's family and friends (citing Manny Ellsworth's report among others) but noted "that such statements have not been given under oath and appear to be largely a repetition of subjective complaints already testified to and reported by the claimant."  (Tr. 28)  Thus, the ALJ actually considered the third party statements but found them insufficient to support Ellsworth's claims.  Ellsworth appears to argue that the ALJ's discussion was insufficient because the ALJ did not specifically refer to Manny Ellsworth's report in the part of the decision in which Listing 12.05C was analyzed.  Ellsworth's argument is not well taken.  As noted above, the ALJ was under no obligation to discuss the report at all or provide good reasons for rejecting the report. And, having mentioned the Manny Ellsworth report in connection with one issue, it is illusory to suggest that the ALJ somehow forgot that report when analyzing a different issue in a different section of his work.

The claimant bears the burden of proving every element of the listing. *King v. Sec'y Health & Human Servs.*, 742 F.2d 968, 974 (6th Cir.1986).  The ALJ's finding that Ellsworth did not prove that he met Listing 12.05C is supported by substantial evidence in the record.  Even if other evidence in the record did support using the low IQ scores as evidence of intellectual disability, since substantial evidence exists to support the ALJ's reasoning, the decision of the Commissioner cannot be overturned. *Jones v. Comm'r of Soc. Sec.,* 336 F.3d 469, 477 (6th Cir.2003); *See Elam v. Comm'r of Soc. Sec.,* 348 F.3d 124, 125 (6th Cir. 2003) ("decision must be affirmed if the administrative law judge's findings and inferences are reasonably drawn from

the record or supported by substantial evidence, even if that evidence could support a contrary decision.")

### C. **State Agency Reviewing Opinion**

Ellsworth argues that the ALJ erred because he accorded significant weight to the opinion of state agency reviewing physician Dr. Patricia Semmelman but did not include in his RFC determination all of the limitations found by Dr. Semmelman, and failed to mention or address these additional restrictions in his decision.  Doc. 14, pp. 16-18.  Specifically, Ellsworth claims that the ALJ did not properly deal with Dr. Semmelman's opinions that (i) Ellsworth "may require repetition and simplification" in instruction and (ii) that he is "moderately limited" in his ability to maintain attention and concentration for extended periods, and complete a normal workday and workweek without interruptions from psychologically-based symptoms.  Id. Defendant argues that the ALJ was not required to adopt every detail in Dr. Semmelman's opinion, despite giving it significant weight.  Doc. 16, pg. 17.  Defendant offers five arguments to support her contention that the ALJ did not misuse the opinions of Dr. Semmelman: (i) Dr. Semmelman did not find Ellsworth disabled, (ii) the ALJ explained his reasons for diverging from Dr. Semmelman's opinion, (iii) Dr. Semmelman did not provide "concrete limitations," (iv) the opinion that Ellsworth may require repetition and simplification of instructions might not preclude employment, and (v) the ALJ actually incorporated the limitation that Ellsworth was moderately limited in his ability to maintain attention and concentration for extended periods in determining plaintiff's RFC.  Doc. 16, pp. 16-19.

Federal regulations establish the hierarchy of how medical opinion evidence should be considered. At the top of the hierarchy are opinions provided by the claimant's treating source. *See Wilson v. Comm'r of Soc.* Sec., 378 F.3d 541, 544 (6th Cir.2004); see also 20 C.F.R. §§

404.1527(c)(2), 416.927(c)(2). Opinions from these sources are entitled to controlling weight so long as the opinion is well supported by acceptable medical evidence and not inconsistent with the other substantial evidence of record. *Wilson,* 378 F.3d at 544.  Next in the hierarchy are opinions issued by examining physicians. 20 C.F.R. §§ 404.1527(c), 416.927(c).  Finally, the adjudicator must consider the findings of nonexamining physicians. 20 C.F.R. §§ 404.1527(e), 416.927(e). Opinions from nonexamining physicians are not entitled to any special degree of deference. *Id.*  However, the regulations recognize that opinions from nonexamining state agency consultants may be entitled to significant weight, as these individuals are "highly qualified" and are "experts in Social Security disability evaluation." 20 C.F.R. §§ 404.1527(e)(2)(i), 416.927(e)(2)(i); *see Barker,* 40 F.3d at 794.

Here, Dr. Semmelman was a non-examining physician and her opinion was not entitled to any special degree of deference.  *Atterberry v. Sec'y of Health & Human Servs*., 871 F.2d 567, 571 (6th Cir.1989).  Thus, the ALJ was not required to "fully describe the opinion" or adopt the opinion wholesale and include every restriction assessed by Dr. Semmelman as Ellsworth suggests.  This is true even when the ALJ assigns that opinion significant weight.  *Smith v. Colvin,* No. 3:13-CV-00776, 2013 WL 6504681, at *11 (N.D. Ohio Dec. 11, 2013).  Rather, the relevant regulations require only that an ALJ explain the general weight given to the opinions of nonexamining physicians.  *Id.* (citing 20 C.F.R. § 404.1527(e)(2)(ii) ("Unless a treating source's opinion is given controlling weight, the administrative law judge must explain in the decision the weight given to the opinions of a State agency ... psychological consultant ... .")) The ALJ, in this case, discussed Semmelman's opinion and explained the weight given to that opinion.  (Tr. 26-27)

This Court has frequently denied remand on this issue and confirmed that there is no

23

legal requirement for an ALJ to explain or adopt every limitation or restriction opined by a state agency nonexamining physician, even when the ALJ has given the opinion "great" or "significant" weight.  *See e.g.*, *Lee v. Colvin*, 2014 WL 4999163, *8-9 (N.D. Ohio Oct. 7, 2014) (ALJ not required to incorporate all limitations from the state agency psychologist despite assigning great weight to the opinion); *Smith v. Colvin,* 2013 WL 6504681, *11 (N.D. Ohio Dec. 11, 2013) (ALJ not required to include in RFC all limitations assessed by state agency reviewing psychologists despite giving significant weight to the opinion); *Marmol v. Comm'r of Soc. Sec.*, No. 1:12CV1930, 2013 WL 1150076, *8 (N.D. Ohio March 19, 2013 (finding that although the ALJ considered the findings and conclusions of the state agency consultative examiner, the ALJ was not required to adopt her entire opinion and include every restriction); *Smith v. Comm'r of Soc. Sec.*, No. 5:11CV2014, 2013 WL 1150133, *11 (March 19, 2013) ("ALJ was not legally required to explain limitations [state agency nonexamining psychologist] imposed that were not incorporated into his RFC."); *Freeman v. Comm'r of Soc. Sec.,* No. 1:12CV2349, 2013 WL 3580393, at *9 (N.D. Ohio July 11, 2013) (holding that the ALJ was not required to adopt the opinion of the state agency physician wholesale and the ALJ's implicit rejection of the restriction was supported by substantial evidence).  Thus, the ALJ's decision not to adopt all of the restrictions set forth by Dr. Semmelman does not, by itself, constitute reversible error.

Indeed, medical and nonmedical evidence substantially supports the RFC as determined by the ALJ.  A claimant's RFC is the most that he can still do despite his functional limitations. 20 C.F.R. §§ 404.1545 & 416.945 *et seq.;* SSR 96–8p, 1996 SSR LEXIS 5.  The assessment must be based upon all of the relevant evidence, including the medical records and medical source opinions.  *Id.*  The final responsibility for deciding the RFC "is reserved to the Commissioner."  20 C.F.R. §§ 404.1527(d)(2) & 416.927(d)(2).  An ALJ does not improperly

24

assume the role of a medical expert by assessing the medical and non-medical evidence before rendering a residual functional capacity finding.  *Poe v. Comm'r of Soc. Sec.*, 342 Fed. Appx. 149 (6th Cir. 2009) (citing *Ford v. Comm'r of Soc. Sec.,* 114 Fed.Appx. 194, 197 (6th Cir.2004). While this Court reviews the entire administrative record, it "does not reconsider facts, re-weigh the evidence, resolve conflicts in evidence, decide questions of credibility, or substitute its judgment for that of the ALJ." *Reynolds v. Comm'r of Soc. Sec.,* 424 Fed. Appx. 411, 2011 WL 1228165 at * 2 (6th Cir.2011) (*citing Youghiogheny & Ohio Coal Co. v. Webb,* 49 F.3d 244, 246 (6th Cir.1995)). *See also Vance v. Comm'r of Soc. Sec.,* 260 Fed. Appx. 801, 2008 WL 162942 at *6 (6th Cir.2008) (stating that "it squarely is not the duty of the district court, nor this court, to re-weigh the evidence, resolve material conflicts in testimony, or assess credibility.")

As noted above, it is well established that an ALJ is not required to discuss each and every piece of evidence in the record for his decision to stand. *See, e.g., Thacker v. Comm'r of Soc. Sec*., 99 F. App'x 661, 665 (6th Cir. 2004).  However, where the opinion of a medical source contradicts her RFC finding, an ALJ must explain why she did not include its limitations in her determination of a claimant's RFC. See, e.g., *Fleischer v. Astrue,* 774 F. Supp. 2d 875, 881 (N.D. Ohio 2011) (Lioi, J.) ("In rendering his RFC decision, the ALJ must give some indication of the evidence upon which he is relying, and he may not ignore evidence that does not support his decision, especially when that evidence, if accepted, would change his analysis.").  In this case, Ellsworth does not argue that Dr. Semmelman's additional limitations contradict the RFC finding but stated that "the ALJ should provide some explanation for his rejection of such opinion, especially, as here, the ALJ did not even mention the whole of the State agency opinion."  Doc. 18, p. 5.  However, in this case, the ALJ did not ignore Dr. Semmelman's report.  In fact, he thoroughly discussed her opinion in two separate paragraphs in

25

his decision. (Tr. 26, 27) The ALJ also recognized that Dr. Semmelman's conclusions differed slightly from those of Dr. Tanley. (Tr. 26) ("While reaching similar functional conclusions as Dr. Tanley, Dr. Semmelman stated that the claimant would have some difficulty understanding and completing tasks given his learning disorder.") The ALJ noted, however, that Dr. Semmelman cited no more than moderate deficits in terms of overall domain functioning and that she opined Ellsworth could understand and follow one-two step oral and very simply written directions, including simple and routine tasks in a work setting that would not demand fast production pace or involve frequent work setting changes. (Tr. 26-27) The ALJ also discussed medical evidence from Dr. Tanley and the doctor's at Unison "pointing to consistently intact memory and attention" and the evidence that Ellsworth assists his roommate with the upkeep of three homes owned by the roommate. (Tr. 27-28; *see also* Tr. 21, citing Exhs. 5F, 6F, 10F, 12F, and 13F.) Dr. Tanley opined that Ellsworth's ability to maintain attention, concentration, persistence and pace for simple tasks and multistep tasks was "unimpaired" during the interview portion of the consultative exam and that the results of the IQ test suggest that he would have little or no difficulty with perceptually oriented tasks and but may encounter significant difficulty as task complexity increased. (Tr. 26, 393) The ALJ also determined, consistent with Dr. Semmelman's opinion, that Ellsworth would have moderate limitations in concentration, persistence, and pace. (Tr. 21). However, the ALJ pointed out that Ellsworth's consistently intact memory, adequate concentration, ability to hold a driver's license, and his ability to assist his roommate with the maintenance of several properties, suggest that he retains the ability to perform simple and routine tasks. (Tr. 21-22) Consistent with the evidence, the ALJ determined that Ellsworth retained the capacity to:

[P]erform simple, routine, and repetitive tasks in a work environment free of fast-paced

production requirements; tolerate occasional changes in the work setting…maintain attention and concentration for two-hour segments over an eight-hour period; and complete a normal workweek without excessive interruptions from psychologically or physically based symptoms.[11]  (Tr. 23)

As discussed above, case law supports the proposition that the ALJ was permitted to give significant weight to Dr. Semmelman's opinion without discussing or adopting every limitation in that opinion.  The ALJ's RFC determination is supported by substantial evidence in the record.  To the extent that the Dr. Semmelman's limitations were more restrictive than the RFC determination, the ALJ clearly articulated the reasons for his RFC finding.  The court should conclude that the ALJ's determination was supported by substantial evidence.

## VIII.  Conclusion

In summary, the ALJ properly determined that Ellsworth does not meet Listing 12.05.  Further, the ALJ was not required to adopt all of Dr. Semmelman's limitations in his RFC determination.  The ALJ's decision is supported by substantial evidence.  Ellsworth has not demonstrated a basis upon which to reverse or remand the Commissioner's decision.  For these reasons, the I recommend that the final decision of the Commissioner be AFFIRMED, pursuant to 42 U.S.C. § 405(g).

Dated: August 5, 2016

Thomas M. Parker
United States Magistrate Judge

## OBJECTIONS

**Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after being served with a copy of this Report and Recommendation.  Failure to file objections within the specified time may waive the right**

---

[11] The ALJ also further restricted Ellsworth to "have no interaction with the public and only occasional interaction with coworkers and/or supervisors."  (Tr. 27-28)

to appeal the District Court's order.  See *U.S. v. Walters*, 638 F.2d 947 (6th Cir. 1981).  See also *Thomas v. Arn,* 474 U.S. 140 (1985), reh'g denied, 474 U.S. 1111 (1986).